Opinion delivered June 2, 1886.

[No. 3932.]

### LEWIS PAULIN *v.* THE STATE.

1. MANSLAUGHTER—ADEQUATE CAUSE.—Adultery of the deceased with the wife of the slayer, provided the killing occurred as soon as the fact of illicit connection was discovered, is one of the adequate causes expressly enumerated in the statute as sufficient to reduce a homicide from murder to manslaughter. (Penal Code, Art. 597.)

2. SAME.—If the provocation be the adultery of the deceased with the wife of the slayer, it is not required to arise at the time of the homicide, and the killing would be only manslaughter, provided it occurred as soon as the fact of the illicit connection was discovered by the slayer. The trial court, therefore, erred in such a case in charging that "the provocation must arise at the time of the commission of the offense," and that the passion "must not be the result of a former provocation."

3. PRACTICE—CHARGE OF THE COURT.—It is expressly provided by statute that the charge of the court shall distinctly set forth the law of the case. If it fails to do so, and an exception is reserved to it, and shown by proper bill on appeal to this court, then it becomes the duty of this court to reverse the case for the error, without inquiry as to the effect such error may have had upon the result of the trial.

APPEAL from the District Court of Coleman. Tried below before the Hon. T. B. Wheeler.

The indictment in this case charged the appellant with the murder of J. W. Henderson, in Coleman county, Texas, on the seventh day of February, 1885. His trial resulted in his conviction of manslaughter, and his punishment was affixed at a term of two years in the penitentiary.

Henry Sacket was the first witness for the State. He testified that he was the proprietor of a store at Camp Colorado, in Coleman county, Texas, about three and a half miles distant from Nations's ranch. Witness heard of the killing of Henderson at

Nations's ranch on the day it occurred. At about one o'clock on that day the defendant, whom witness did not then know, came to witness's store, bought ten cents worth of crackers and cheese, and inquired the way to Child's place, near Nations's ranch. Witness gave him directions, and he left, but witness could not say in which direction he went. Witness did not see what kind of an animal he rode to the store, but while he was in the store there was a brown or bay mule hitched to the rack in front of the store.

J. R. Nations testified, for the State, that he knew the defendant, and knew J. M. Henderson, who was killed by the defendant on the seventh day of February, 1885. Henderson was killed on the witness's ranch, where, at the time of his death, he had been at work for fifteen days. Witness first observed the defendant as he approached witness and Henderson at work on a hay stack. He was about fifteen steps distant, coming from towards the east side of the field. He had a pistol in his hand, walked up to a point within ten feet of Henderson, who had not yet seen him, exclaimed: "D—n you, I have got you at last!" and fired. Henderson fell or jumped from the hay stack and ran. Defendant followed and fired two more shots at him. Witness then started towards his house, and heard other shots fired. The house was some five hundred yards distant from the hay stack. Rawls and witness then started out to look for the defendant. While out stock hunting about an hour before the shooting, the witness saw a brown or bay mule standing hitched to a tree at the head of a dry lake, about one thousand yards south east from the point where the shooting occurred. The dry lake was not on a public road. Its surroundings were somewhat brushy. Rawls and witness directed their course towards the head of the dry lake. When they reached a ravine between eight hundred and one thousand yards distant from the house, the defendant rose up from behind a bank and confronted them with his pistol in his hand. Witness and Rawls stepped back, and defendant went on. Witness saw the dead body of Henderson thirty minutes later. He last saw the defendant on the day of the killing going towards the point on the dry lake where he, witness, had previously seen the mule hitched. The killing occurred about sunset on the evening of February 7, 1885. On the next morning the witness traced the track of a man from the point where the killing occurred to the point where the mule was hitched. When the witness first saw the mule at the lake,

about an hour before the killing, he called loudly for the owner, but could not get an answer. Deceased was making no effort to injure the defendant at the time of the shooting.

J. A. Rawls was the next witness for the State. He testified that he was at Nations's ranch when Henderson was killed. He heard the reports of the pistol when the fatal shots were fired. Just after the shooting, the witness went with Nations in search of the man who did the shooting. When they reached a ravine between eight hundred and one thousand yards distant from the house, a man who was concealed behind a bank confronted them with a pistol in his hand. Nations and witness stopped and exchanged some words with the man, who finally went on towards the dry lake. Witness could not recognize the defendant as that man. Witness saw the dead body of Henderson. Several balls had passed into the body. One entered the head and another the groin. On the morning after the shooting, the witness and others followed the track of a man from the place of the killing to the point where the mule had been hitched near the dry lake. The tracks followed the meanders of Jim Ned creek. Deceased was shot on low land. High hills overlooked that point on the north. The place of killing could be easily seen from those hills. The mule's track led around those hills to the point on the dry lake where the mule was hitched. That place was surrounded by hills.

W. P. Rasco testified, for the State, that he was one of the jury of inquest over the body of Henderson. He described the location of the six wounds on the deceased's body. He saw the mule tracks leading around the hills to the point on the dry lake where the mule was tied, and thence east from that point. The tracks going east showed that the mule was running when it made those tracks.

Deputy sheriff W. D. Crain testified, for the State, that on the Tuesday after the fatal Saturday, he went to the defendant's ranch, in Hamilton county, and found him preparing to kill some hogs. He asked the defendant: "Are you the man who killed Henderson?" He replied that he was not, and witness arrested him.

Cross-examined, witness said that he did not know the defendant, nor did the defendant know him at the time of the arrest. When he asked defendant if he was the man who killed Henderson, witness had not yet exhibited his warrant, nor proclaimed his official character. Witness arranged his pistol in front of

his person before accosting defendant, in order to have it ready in the case of need. Defendant did not see the witness arrange his pistol. Deputy sheriff Rice, of Hamilton county, was present at the time of the arrest. The State closed.

A. D. Love was the first witness for the defense. He testified that he had known the defendant for about five years at the time of this trial. Defendant was a married man, with a daughter four or five years of age, and a son about two years old. Defendant lived in Hamilton county, Texas, eighty or ninety miles from the town of Coleman. He and his wife lived together until about the first day of January, 1885, when they separated. Mrs. Paulin, defendant's wife, after her separation from her husband, stayed a while at M. D. Henderson's house, a while at Saulter's house, and then went back to Georgia. Henderson, the deceased, worked for the defendant about one year prior to January 1, 1885. Witness lived on the defendant's land, about one-half a mile from the defendant's residence. Witness went to the town of Hamilton with the defendant, in his wagon, on the Monday before the Saturday of the killing. En route, witness told defendant that he, witness, had been told that he, defendant, had caught the deceased in bed with his wife, and that the separation from his wife was the result of that discovery. Defendant became highly excited and angry. He wept bitterly; said that the statement was "as d—d a lie as was ever told;" that his wife had left him, but was nevertheless a virtuous woman, and that he proposed to vindicate her character. He then demanded of the witness the name of the person who told the report to him. Witness told him that Fatheren was his authority. After their arrival in the town of Hamilton, witness saw the defendant go to Fatheren's barber shop. Defendant grew wild upon the subject of his wife's imputed infidelity, and, in the opinion of the witness, became insane upon that question. The witness next saw the defendant on the following Wednesday morning at his, witness's, house. He was then in a worse condition than when witness last saw him, and was, witness believed, crazy. He had seen one Sutton in the mean time. He would talk about his wife and children, and curse and swear furiously. He would suddenly quit talking, walk rapidly off, some times as far as fifty yards, and then come back. He was totally unlike his former self. His eyes wore a wild look, and he was completely beside himself. M. D. Henderson and his wife, who lived in the neighborhood, also observed the change in the defendant, talked to the witness

about it, and said that they thought the defendant· crazy. Witness heard the report of the adultery between the deceased and Mrs. Paulin about a week or ten days before he informed defendant of it. He had not found it convenient to do before, and, besides, he had his private reasons for not doing it. That reason was that he had been told the defendant suspected him of supplying his wife with money to pay her way to Georgia, and was angry about it. Witness made no effort to restrain the defendant after he concluded defendant was crazy, except by talking to him. He knew that the defendant was not crazy enough to hurt himself.

L. L. Fatheren testified, for the defense, that, on the Monday prior to the killing, the defendant met him in the town of Hamilton, and asked him about a report which had been communicated to him by Love as coming from him. Witness told defendant that Mr. James had told him of the report, and that he repeated it to Love. Defendant did not call on witness at his shop, but saw him at the livery stable.

J. T. James testified, for the defense, that the defendant came to him in the town of Hamilton, on the Monday before the fatal Saturday, and asked him about a rumor concerning his wife and the deceased. Witness told him that he had received the report from Doctor Pogue, and referred him to the said Pogue. Defendant was very much excited, and very angry.

Doctor Pogue testified, for the defense, that defendant came to see him in the town of Hamilton, about the report of his having caught his wife and deceased in bed together. Witness had previously heard a man whom he did not know, make that statement to Mr. Sperlin. Mr. Sperlin being then absent from the State, witness looked around town for the strange man, and finally referred defendant to Mr. Horton.

Doctor George F. Perry testified, for the defense, that he heard the defendant talking to Doctor Pogue about a report to the effect that a criminal intimacy existed between his, defendant's, wife and the deceased. Defendant was much excited and very angry. He said that the report had to be straightened out by the man who started it.

C. E. Horton testified, for the defense, that the defendant came to him in the town of Hamilton, on the Monday before the fatal Saturday, to ascertain the name of the party who started the report that his wife had been criminally intimate with the deceased. Witness referred him to the witness Sutton as the

author of the report. Defendant, very angry and greatly excited, denounced the report as false, and said that it had to be straightened up.

William Sutton testified, for the defense, that he and the defendant, defendant's wife and the deceased, were all from the same neighborhood in Georgia. They were acquainted with each other before they left Georgia. Deceased came from Georgia a few years ago, and hired to the defendant, who was then running a farm and sheep ranch in Hamilton county, Texas. On the Tuesday before the fatal Saturday, the defendant came to the witness in Captain Hunt's field, which was situated about six miles distant from his place, and had a talk with him about a report to the effect that he, defendant, had caught his wife in bed with the deceased. He said that he proposed to vindicate his wife's character. Witness told him that vindication was impossible. Defendant asked witness what he meant. Witness told him, in reply, that deceased had told him that he had been having carnal intercourse with his, defendant's, wife. Witness told defendant that, at a barbecue, in the preceding August, deceased told him that, during the previous July, he and the defendant's wife were the watchers over a sick child at a neighbor's house; that they started to the defendant's home during the night, Mrs. Paulin under his escort, and that en route she yielded to his importunities, and he and she spent the balance of the night together on the prairie; that deceased afterwards told him of his repeated acts of carnal intercourse with his, the defendant's, wife. This information appeared to distress the defendant greatly, and he wept bitterly. In the opinion of the witness the defendant, at that time, was crazy. He made no effort to injure the witness. Witness had no occasion to attempt restraint upon him. Two or three days after defendant and his wife separated, which was before the conversation detailed above, the defendant told witness that deceased was the cause of the separation, but was not to blame. A few days after the defendant made that statement to witness, deceased and witness were at defendant's house, and deceased and defendant had a settlement.

Mrs. Shive testified, for the defense, that she lived about two miles from the defendant's house. She knew the defendant, and his wife. Witness frequently saw a man whom she did not know, but who she was informed was the deceased, at the defendant's house, and at church. The defendant's house could be seen by one approaching it for the distance of at least a mile, and

a person could be seen an equal distance from the house. The ground near the house was covered with pebbles and rock, over which it was impossible for a wagon to pass without making a noise. On one day in the summer of 1885, the witness went to the defendant's house with her husband in a two horse wagon. They made no effort to conceal their approach, but drove up to the house talking and regardless of noise. They got out of their wagon at the front gate, and passed through it up to the house. No one meeting them, witness stepped up on the gallery, to the front door, and first knocked at the door with her hand, and then tapped with her fan. Receiving no answer, witness pushed open the door, and saw Mrs. Paulin lying across the bed with her clothes drawn up, exposing her person from her breast down. A man was standing by the side of the bed, pushing his shirt into his pants, and endeavoring to secure his pants around his body. The man passed out of the house through the kitchen to the well. Witness ran quickly to Mrs. Paulin and told her to get up instantly as her, witness's, husband was at the door. Mrs. Paulin, instead of making an effort to rise, remained on the bed with her clothes up and her person exposed. Witness made an unsuccessful effort to pull her clothes down, and in doing so got her hand defiled. Mrs. Paulin got up presently, and witness and her husband, after remaining at the house a short time went home.

Cross-examined, the witness said that she told no one of what she saw at the defendant's house on the occasion of her said visit until after the killing of Henderson. Witness first told the defendant's mother, on her arrival in Texas from Georgia, after the killing of Henderson. When witness and her husband passed from their wagon into the defendant's yard, on the occasion spoken of, they talked unusually loud in order to attract the attention of those inside. The doors of the defendant's house were open when witness and her husband arrived, and the two children of the defendant were in the room with their mother, the three year old daughter being asleep, and the fifteen months old child being awake. Mrs. Paulin was not asleep. Witness did not know the man she caught in *flagrante delicto* with Mrs. Paulin. Witness was a married woman, had read a few medical books, and knew very well with what substance she defiled her hands in her attempt to pull down Mrs. Paulin's clothes. Old Mrs. Paulin, the defendant's mother, had asked witness once about her discovery since the killing of Henderson. Old Mrs.

Paulin has lived with her son at various times, and was a teacher in the same Sunday school in which the witness was a teacher. Defendant had neighbors living within a quarter and a half a mile of him.

J. W. Shive testified, for the defense, that he went with his wife on the occasion of her visit to defendant's house to which she testified. No effort was made to conceal their approach of the house. On the contrary, when they got into the yard, he and his wife talked louder than usual to attract attention. When witness stepped upon the gallery, and his wife began to knock on the door, witness, looking through the open door, saw the exposed form of a woman lying across the bed. He thereupon walked across the gallery, making. no effort to muffle his footsteps, and went on to the well, where he encountered the defendant, whom he knew. Defendant filled a water keg and went to the field.

M. D. Henderson testified, for the defense, that the deceased was a distant relative of his. Deceased left Hamilton county on or about January 6, 1885. The day before his departure, he and defendant ate dinner together at the witness's house. Defendant was at the witness's house two or three days before the Saturday on which the deceased was killed. It was the opinion of the witness, founded upon the actions, appearance, and talk of the defendant on that occasion, that he was then crazy.

Mrs. M. D. Henderson testified substantially as did her husband.

W. T. Croffer testified, for the defense, that he knew the defendant to be a friend to the deceased at the time that the latter left Hamilton county. Deceased left Hamilton county because of trouble about a pistol. Defendant went to Hamilton to attempt a settlement of that trouble for the deceased, offering to pay his fine. This witness and five others testified that the defendant had always maintained, in Hamilton county, a good reputation for peace and quietude. The defense closed.

Henry Sacket, recalled by the State, testified, in rebuttal, that when at his store on the day of the killing, the defendant was sane. Such, at least, was the witness's opinion. He did not appear in the least excited.

M. D. Crain testified, for the State, in rebuttal, that, in his opinion, the defendant was sane when arrested by him on the Tuesday after the homicide.

Joshua Watson was introduced by the State, and identified

the handwriting of certain letters as that of the defendant. The first letter reads as follows:

"PRAIRIE RANCH, January 2.

"*Mr. W. A. Brown,*

"Dear cousin:—I have been to town twice to meet you, and you have not come. I hope you have not given out the idea of coming, as I intend to place my business entirely in your hands. I am going to leave. It is hell to me to be on the place at all, although now, of all times, it is necessary for me to be here. I now write you some of my intentions for you to carry out. In the first place you are to have control of every thing. I will leave a note by which you can get credit. If you need money, I will try to make arrangements with Ed, and he will furnish it. The sheep must be fed till grass starts. The boys know how I have been feeding. I have bought a good deal of bran and shorts mixed, of which there is still due me seven hundred and fifty-eight pounds, or something like it. You had best to bring that home. Mr. Salter has ten dollars of my money, that I gave him to put in feed for me. You can get that too. if you need the feed. The boys I have with me, William Kearns and Charley Salter, are both good boys, I think, and will do their duty. You are to see to it that the sheep are out to graze for from sun up till eight o'clock—owing to the morning. If it is very cold, and raining or sleeting, so that sheep are liable to get wet or injured, it will be best to give two feeds, one in the morning and eve. When the sheep go to lambing, about the tenth of March, after forty or more are dropt, throw the two herds together, yearling lambs and ewes, and let Charley take the lamb herd— little lambs. The pen must be divided into two parts by means of those portable panels (some are in the field).

"Also, you are to have a pen for your bunch, which will consist of all the young lambs under three days old, or that are not owned by their mother. If a ewe does not own her lamb, put it in a stall with it at night, feed it well, and turn her out with it in the day. You can make your pen under the north east corner of the shed. If you keep up during the day, you will have to feed sheaf oats, which you will have to buy, say one hundred bundles. You had best get some lamp black, and make a paint, and mark a ewe and lamb in the same number, so you will know them.

In regard to the farm, I wish all of this wheat in next to the

house to stand.    That piece in the south west I want sowed in millet about the first of April.    As soon as you get here you must commence plowing in oats on the other side of drain.    You can pick seven acres of land and plant in corn before the eighth of March, as after that time you will be busy with lambs.    I did intend planting on new ground some sorghum for syrup, and a good deal for feed.    You can, if you have time.    In regard to the hogs, I have three young sows that I want penned and fattened on shorts and bran.    You had best pickle all of the meat.    Mrs. Henderson will assist.    Marie has been committing adultery with Jud Henderson since last July.    I did not know it till day before yesterday.    I wish nothing said of it till I can see you again.    If I get killed, I do not want her to have anything from my estate.    I can prove it, and have no more doubt of it than I am writing to you now.    In regard to wages, I will give you twenty-five dollars per month, you board yourself.    You can also board the boys, which I will pay.    They are getting fifteen dollars per month.    Will must get fifteen dollars and washing after the first month.    Doctor Glass has a horse which he will let you have.    You will have to give him one feed of oats a day. You must buy some oats—seed oats—on time, if I have not left the money with George F. Perry.

"Knowing you will do your best for me,

"I am your cousin and friend,

"LEWIS PAULIN."

The second letter reads as follows:

"SHIVE, TEXAS, March 15.

"*Dear Uncle*:

"I have been rather expecting a letter from you since your return home, but have not received it yet.    Have received letters from Ed and mother.    They wrote me that they would start on Thursday, yesterday, and would be in Coleman City by the sixteenth—the first day of court.    I will leave to-morrow and go in a hack, in order to bring them home with me.    I do not think the case can come off this court.    Sutton has left the country, and it will be hard to get him here in time.    Every thing is still in my favor, so far as I know; Smith and Sutton being the only ones that have taken any stand against me, and public sentiment is so entirely in my favor that they could do nothing against me.    I have not engaged my attorney yet.    Goodson

charged me just a smooth one thousand dollars, which don't, to say the least, correspond with either my feelings or my intentions. Will get some of the lawyers here, I guess. There are others of known ability. In regard to having Albert's throat treated, if you think any good can be done, of course have it done. You know my business is extremely tight on me now, but his and Aunt Henrie's expenses on the trip I will pay as soon as I am able. I am through sowing oats and planting corn. My oats are up nicely. Sheep commenced lambing to-day. Love to Aunt Henrie. Tell Walter that I will write soon. Would like to hear from my wife. With a kiss for my poor little boy, I will close. Will let you hear from me again soon.

"Yours affectionately,          L. Paulin."

Charlie Sutton testified, for the defendant, that he went to work for the defendant on the fifth day of January, 1885. William Kearns began work for the defendant on the thirteenth day of January, 1885. Kearns came to defendant's house on the sixth day of January, the day after the witness's service commenced, but only to see defendant. He commenced work on the thirteenth day of the month.

L. J. Salter testified, for the defendant, that his son, Charlie Salter, began work for defendant on January 5, 1885.

Mrs. L. J. Salter testified, for the defense, that the defendant and his wife were her cousins. W. A. Brown was also her cousin. Defendant's wife stayed at the house of Mrs. Henderson a few days after her separation from her husband, and then came to the house of the witness, in the town of Hamilton, whence she went to Georgia. She came to witness's house on the eighth day of January, 1885, and started to Georgia on the twenty-sixth day of the same month. Defendant was in the town of Hamilton once at least, between January 8 and January 26, 1885, expecting to meet W. A. Brown.

The motion for new trial raised the questions discussed in the opinion.

The conviction in this case was affirmed by the court upon the first submission of the cause, but, at the subsequent day of the term, a rehearing was granted, the affirmance set aside, and the judgment reversed for reasons which are clearly disclosed in the opinion.

*G. H. Goodson, C. K. Bell* and *H. T. Sims,* for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE.    Henderson was killed on the seventh day of February, 1885.    Our opinion affirming the judgment in this case, at a previous day of this term, was based upon the assumption that appellant's letter to W. A. Brown, as set forth in the statement of facts, was correctly dated "Jany 5," and that, if such was the case, then it was established by said letter that defendant knew, at the time it was written, of Henderson's adultery with his wife, and that if he did, in fact, know it at that time, he had, by his subsequent acts and conduct towards Henderson, deprived himself of the right to claim that the killing was on account of Henderson's adultery with his wife,— the killing being a month after he knew the fact, and after he had had several opportunities to take Henderson's life, and had not done so.

In this aspect of the case, the charge complained of as erroneous could not possibly have affected the rights of appellant, notwithstanding that it might have been abstract error; and, having been corrected in the subsequent portion of said charge, when the law was applied directly to the facts, we held that, taken as a whole, the charge was correct.

But on this motion for rehearing it has been made to appear to us that defendant's letter, instead of having been written as dated, on *January 5*, was in fact written on *February 5*, and but two days prior to the killing.    Such being the case, the evidence establishes the killing on the first meeting after appellant had been informed of the adultery of the appellant's wife with the deceased.

One of the adequate causes expressly enumerated in the statute as sufficient to reduce a homicide from murder to manslaughter is: "Adultery of the person killed with the wife of the person guilty of the homicide, provided the killing occur as soon as the fact of an illicit connection is discovered." (Penal Code, Art. 597, subdiv. 3.)    In such case, the provocation is not required to arise at the time of the commission of the offense, because the adultery may have occurred before the killing, and yet the killing would be only manslaughter, provided that the killing occurred as soon as the fact of an illicit connection had been discovered by the husband.    It is manifest that in such case it would be, to say the least of it, not only misleading, but erroneous, to charge that "the provocation must arise at the time of

the commission of the offense," and that "the passion is not the result of a former provocation," as stated in subdivision 1 of Article 594 of the Penal Code.

The same rule obtains as in cases of insulting words and conduct towards a female relation. In all this class of cases the provocation arises before the commission of the offense, and consequently the passion is, ordinarily, in fact the result of a former provocation, and not one arising at the time of the commission of the offense. The charge of the court, in this instance, was not only erroneous in the particular complained of, but defendant excepted to it at the proper time (Phillips v. The State, 19 Texas Ct. App., 159), and reserved a bill of exceptions to the same, which is incorporated in the record. A charge is required to distinctly set forth the law applicable to the case. (Code Crim. Proc., Art. 677.) "And if it fails to do so, and an exception is reserved to it as shown by bill of exception, on appeal to this court, then it is the duty of this court to reverse the case for the error, without further inquiry as to the effect such error may have had upon the result of the trial." (Niland v. The State, 19 Texas Ct. App., 166; Code Crim. Proc., Art. 685; Bravo v. The State, 20 Texas Ct. App., 188; Clanton v. The State, 20 Texas Ct. App., 615.)

Because of the error in the charge of the court as pointed out by defendant's bill of exceptions, our judgment heretofore rendered affirming the judgment in this case, is set aside, the rehearing is granted, and, on account of said error, the judgment is now reversed and the cause remanded.

*Reversed and remanded.*